# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

|                                      |        |                      |
|--------------------------------------|--------|----------------------|
| BRAVE MARITIME CORPORATION, INC.,    | *      |                      |
| v.                                   | *      | Civil No. JFM-15-1501 |
| GLOBAL MARKETING SYSTEMS, INC.,      | *      |                      |

## MEMORANDUM

Plaintiff Brave Maritime Corporation, Inc. ("Brave") brings suit against Global Marketing Systems, Inc. ("GMS") seeking damages for breach of contract. GMS has filed a motion to dismiss. (ECF No. 19). The parties have fully briefed the motion and no oral argument is necessary. *See* Local Rule 105.6. For the reasons set forth below, GMS's motion to dismiss is granted.

## BACKGROUND

The current dispute arises out of a putative business relationship between Brave, a shipping concern incorporated under the laws of Liberia and headquartered in Greece, and GMS, a company incorporated and headquartered in Maryland. According to Brave, in the spring of 2014, a GMS advisor approached Brave to pursue a business relationship. (ECF No. 1, ¶ 6). The parties began discussing a joint venture involving the acquisition and operation of a fleet of shipping vessels, with the hope that the venture would eventually be listed on an U.S. stock exchange. *Id.* at ¶ 7.

On April 2, 2014, the parties created an initial Memorandum of Understanding, which the parties designated as non-binding. *See generally id.* at Ex. 1. Following the Memorandum, the parties continued negotiations and again memorialized their understandings in a document titled

1

"Final Recap" on April 28, 2014.  *See generally id.* at Ex. 2.  The Final Recap was intended, "to serve as an outline of the mutual understanding of the current structure of the Brave/GMS [initial public offering] transaction."  *Id.* at Ex. 2, p. 2.  The Final Recap laid out the terms of the parties' negotiations, including, *inter alia*: (1) how many vessels the joint venture would control; (2) required capital contributions from each party; (3) a tentative schedule for execution of the Final Recap; (4) a financing structure; (5) operational plans; (6) a holding structure; and (7) governance provisions.

According to Brave, from May to November 2014, the parties negotiated other agreements related to the Final Recap, including a Joint Venture Agreement.  *Id.* at ¶ 10.  Brave claims that, by November 20, there were no issues left for resolution.  *Id.* at ¶ 13.  Brave alleges that it began taking steps to execute the Final Recap, including transferring shares of ship holding companies to GMS's nominee.  *Id.*  At the same time, Brave sought to arrange a time and place to meet with GMS to sign the Joint Venture Agreement.  Shortly thereafter, in the face of downward shifting ship prices, GMS refused to sign the draft Joint Venture Agreement and demanded renegotiation.  In subsequent correspondence, GMS denied the Final Recap was a binding, enforceable contract.

Brave filed the instant complaint on May 22, 2015.  (ECF No. 1).  GMS filed a motion to dismiss all claims in the complaint on August 17, 2015.  (ECF No. 19).

**STANDARD**

When ruling on a motion to dismiss, a court accepts "all well-pled facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint."  *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009).  However, courts should not afford the same deference to legal conclusions.  *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint, relying on only well-pled factual allegations, must state a "plausible claim for relief." *Id.* at 678. The "mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012). To determine whether a complaint has crossed "the line from conceivable to plausible," a court must employ a "context-specific inquiry," drawing on the court's "experience and common sense." *Iqbal*, 556 U.S. at 680.

## ANALYSIS

As a preliminary matter, the parties disagree on whether the Greek or Maryland law is applicable.[1] When sitting in diversity, as here, this court applies the choice of law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). To determine the substantive law of a contractual dispute, Maryland courts follow the principle of *lex loci contractus*, which applies the law of the jurisdiction where the parties formed the alleged contract.[2] *See, e.g.*, *Allstate Ins. Co. v. Hart*, 611 A.2d 100, 101 (Md. 1992).

In the present case, the issue of where the parties formed the alleged contract is muddled. GMS contends that the last act forming the Final Recap occurred in Greece. (*See* ECF No. 19, p. 7). For its part, Brave argues the court cannot consider GMS's allegation because it is outside the pleadings—but itself provides no conflicting version of events. (*See* ECF No. 26, p. 16). Thus, Brave argues that, on the motion to dismiss, Maryland contract law should apply to the

---

[1] While the parties agree that diversity jurisdiction applies, they dispute that admiralty jurisdiction does as well. Given Brave has not drawn this court's attention to differences between federal common law and Maryland and Greek law; I find it unnecessary to address the complicated question of whether admiralty jurisdiction applies.

[2] Brave argues that Greek choice of law principles would direct this court back to Maryland substantive law. However, Greek choice of law rules would require this court to engage in a fact-intensive, totality of the circumstances inquiry that is inappropriate at this preliminary stage. Regardless, the result is the same.

3

dispute. Although Brave fails to offer a clear explanation of where the parties formed the contract, Brave is technically correct on this point.[3] *See* Fed. R. Civ. P. 12(d).

Brave avers that the Final Recap constitutes a binding preliminary agreement. Under Maryland law, a binding preliminary agreement, *i.e.*, "a contract to make a contract," is cognizable under two theories. *Falls Garden Condo. Ass'n, Inc. v. Falls Homeowners Ass'n, Inc.*, 107 A.3d 1183, 1190 (Md. 2015) (internal citations omitted). The first is a Type I agreement, where parties have reached full agreement, "on all issues perceived to require negotiation," and the parties merely desire "more elaborate formalization of the agreement." *Y.Y. v. State*, 46 A.3d 1223, 1233 (Md. App. 2012) (citing *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987)) (internal quotation marks and citations omitted).[4] The other is a "Type II" agreement, where the parties agree on the major terms of the contract while recognizing "the existence of open terms that remain to be negotiated." *Id.* Signatories to a Type II agreement are obligated to continue negotiating in good faith. *Cochran v. Norkunas*, 919 A.2d 700, 707 n.5 (Md. 2007).

---

[3] In any event, while I profess no great knowledge in Greek law, I find that Greek law is essentially comparable to Maryland law. Both parties submit sworn declarations from Greek attorneys evaluating the dispute under Greek law. It is undisputed that Greek law recognizes enforceable preliminary agreements. *See* Greek Civil Code Art. 166. As under Maryland law, Greek law relies on two central questions—whether the parties intended to form a contract and whether the essential terms (essentialia negotti) are sufficiently definite—to determine the viability of an alleged contract.[3] (*See* ECF No. 19, Ex. B, pp. 2–3, 64 (noting that under Greek law, "the declaration of intent is the most essential part of the transaction . . .")). Moreover, during negotiations "for a conclusion of a contract," the parties are obligated to negotiate in good faith and in accordance with business ethics. Greek Civil Code Art. 197; (ECF No. 26, Ex. 1, p. 8). If a party, through its "fault causes damage to the other party," it is obligated to pay damages even if a contract has not been concluded. Greek Civil Code Art. 198; (ECF No. 26, Ex. 1, p. 8).

[4] Maryland courts have cited the seminal *Teachers Ins.* standard for preliminary agreements approvingly in a number of cases. *See, e.g.*, *TecArt Indus., Inc. v. Nat'l Graphics, Inc.*, 181 F. Supp. 2d 451, 455 (D. Md. 2002) (citing *Teachers Ins.* and noting that the *Teachers Ins.* standard had been used in three prior District of Maryland cases).

4

The two most important questions when determining the viability of a preliminary agreement are: (1) whether the parties intended to be bound; and (2) whether the essential terms are definite. *See id.* at 708. The two inquiries are interconnected: "[d]efiniteness may show finality and presence of an intention to be bound." *Falls Garden*, 107 A.3d at 1191 (internal quotation marks and citations omitted). In determining the parties' intent, Maryland follows the objective theory of contractual interpretation, which requires a court to look first to the plain language of the contract; if the court finds ambiguity there, it then examines the subjective intent of the parties. *See Dennis v. Fire & Police Employees' Ret. Sys.*, 890 A.2d 737, 748 (Md. 2006).

### A. Application of the Law to the Facts

Although the question is close, I conclude that the parties did not intend for the Final Recap to be binding.[5]

Let me first state the facts that seem to indicate that the Final Recap was deemed to be binding. First, the subject matter of the Final Recap was plainly delineated—Brave and GMS (or its nominee) agreed to work together to create "a fleet of 7-12 vessels prior to [an] IPO." (ECF No. 1, Ex. 2, p. 2). Once public, the Final Recap indicated the parties intended to increase their fleet "to approximately 30-40 vessels." Both parties' obligations under the Final Recap were also sufficiently clear. Under § 2 of the Final Recap, Brave committed at least $40 million to the project and GMS was obligated to invest $20 million and to attempt to raise $30 million from investors on a "best efforts basis." *Id.* Brave pledged six ships—two ships it already owned and four ships under construction—to the parties' holding company in exchange for shares. In return for its $20 million contribution, GMS would receive a 31.25% share in the ships' special purpose

---

[5] I would deny the motion to dismiss if I thought it was without merit. I note, however, that by granting the motion to dismiss, I am saving the parties the expense of discovery.

5

holding companies alongside shares in the parties' company. The parties also agreed to valuations for the ships and detailed a financing structure for the nascent fleet.

Beyond the determinate language of some of the Final Recap's provisions, Brave has also pled other facts possibly showing the parties intended to contract. For example, the parties designated the initial Memorandum of Understanding nonbinding, yet the Final Recap contained no such provision. (*See* ECF No. 1, ¶¶ 7–8). Brave also submits that the title of the Final Recap illustrates the parties' intent to be bound—Brave argues it is customary in maritime shipping charter transactions for the term "recap" to capture "the final and already agreed terms" of a charter. (ECF No. 26, Ex. 1, p. 12). Further, Brave alleges that it took steps to execute the Final Recap by transferring shares of the ship holding companies to GMS's nominee, indicating Brave's intention to be bound. *Id.* at ¶¶ 12–13.

Four facts persuade me, however, that the Final Recap was not meant to be binding. First, the first sentence of the recap stated that, "[t]his recap is to serve as an outline of the mutual understanding of the current structure of the Brave/GMS IPO transaction." An "outline of mutual understanding" is hardly a binding commitment, and the words "current structure" imply that the transaction might be changed in the future. Second, the Final Recap referred several times to "GMS (or nominee)," and a footnote at the end of the document stated that, "[f]or purposes of this recap, GMS refers to GMS's nominees and other co-investors." It is difficult to envision a binding agreement where the parties to the agreement are unknown.[6] Third, the Final Recap was only five pages long and summary in its terms. It would be strange

---

[6] In the joint venture agreement eventually drafted but unsigned by the parties, the party to the joint venture on defendant's side apparently was not GMS but an entity to be known as Evita Investment, Ltd., headquartered in the Marshall Islands. Further, an email sent by GMS during the negotiations about the joint venture agreement indicated it was acting only as an agent. Although not alleged in the Complaint, these facts appear to be undisputed.

to have a binding commitment for a multi-million dollar transaction, which ultimately might result in the issuance of an initial public offering and the listing of shares on an American stock exchange, set forth in such a cursory document.  Finally, at least two significant terms were left for further negotiation in the Final Recap: "the mechanics of how the equity will be exchanged for shares" and circumstances under which the public listing of the company should go forward. These are not issues that could be resolved by application of the rather vague overarching principle, applicable under both Maryland and Greek law, that the parties were obligated to continue to negotiate in good faith.

## CONCLUSION

For these reasons, I find that the Final Recap did not constitute a binding preliminary agreement.  Accordingly, GMS's motion to dismiss will be granted.


    10/30/2015                                                      /s/

Date                                                            J. Frederick Motz
                                                                 United States District Judge